NO. 25-10072

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

OCONEE LANDING PROPERTY, LLC.

Petitioner/Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE

Respondent/Appellee.

Appeal from the United States Tax Court
Civil Action File No. 11814-19

## APPELLANT'S BRIEF

Vivian D. Hoard
Georgia Bar No. 358119
*vhoard@foxrothschild.com*
FOX ROTHSCHILD LLP
999 Peachtree St., N.E.
Suite 1500
Atlanta, Georgia 30309
(404) 962-1000
*Counsel for
Petitioner/Appellant*

Kip D. Nelson
NC Bar No. 43848
*knelson@foxrothschild.com*
FOX ROTHSCHILD LLP
230 North Elm Street
Suite 1200
Greensboro, NC 27401
(336) 378-5200
*Counsel for
Petitioner/Appellant*

Elizabeth K. Blickley
DC Bar No. 981722
*eblickley@foxrothschild.com*
FOX ROTHSCHILD LLP
2020 K Street, N.W.
Suite 500
Washington, DC 20006
(202) 794-1269
*Counsel for
Petitioner/Appellant*

*Oconee Landing v. Commissioner*
Docket No. 25-10072

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u><br><u>CORPORATE DISCLOSURE STATEMENT</u>

Counsel for Petitioner/Appellant certify that the following persons and

entities have an interest in the outcome of the case:

Bernhardt, Brian C., Counsel for Petitioner/Appellant;

Blickley, Elizabeth K., Counsel for Petitioner/Appellant;

Coughlin, Richard A., Counsel for Petitioner/Appellant;

Fox Rothschild LLP;

Hartford, James G., Counsel for Respondent/Appellee;

Hoard, Vivian D., Counsel for Petitioner/Appellant;

Humphreys, Laurie A., Counsel for Respondent/Appellee;

Klimas, Geoffrey J., Counsel for Respondent/Appellee;

Lauber, Albert G., Senior Judge;

March, Hilary E., Counsel for Respondent/Appellee;

Nelson, Kip D., Counsel for Petitioner/Appellant;

Oconee Landing Property, LLC;

Rennie, Douglas C., Counsel for Resondent/Appellee;

Scheherazade R. Ferrand, Counsel for Respondent/Appellee;

United States of America; and

Weaver, Benjamin H., Counsel for Respondent/Appellee.

*Oconee Landing v. Commissioner*
Docket No. 25-10072

## **CERTIFICATION PURSUANT TO 11TH CIR R. 26.1-3(b)**

No publicly traded company or corporation has an interest in the outcome of the case or appeal.

Respectfully submitted this 21st day of May, 2025.

/s/ Vivian D. Hoard
Vivian D. Hoard
Georgia Bar No. 358119
*vhoard@foxrothschild.com*
FOX ROTHSCHILD LLP
999 Peachtree Street, N.E.
Suite 1500
Atlanta, Georgia 30309
(404) 962-1000 – *Telephone*
(404) 962-1200 - *Facsimile*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner-Appellant Oconee Landing Property, LLC ("Oconee") believes that oral argument is warranted in this case for several reasons. First, the Tax Court below created a new approach to trial practice. It overruled objections in bulk and admitted hundreds of exhibits simultaneously, before any witness was called. This approach presents an important issue for this Court to consider: do Tax Court proceedings follow different procedures and evidentiary rules than other types of trials? Oral argument would assist the Court in understanding the ramifications of the Tax Court's decision. Second, this appeal presents several questions of first impression about the meaning of Section 170 of the Internal Revenue Code. Oral argument would be beneficial because this Court's decision will have significant impact on pending and future cases involving that statute. Third, the sheer magnitude of the record (totaling many thousands of pages) makes it difficult to convey the full scope of proceedings in a brief, especially when it appears that thousands of pages were not included in the record on appeal. Oral argument would assist the Court in getting a more complete picture of the issues on appeal.

i

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CITATIONS ........................................................................... iv

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION...........................................................2

STATEMENT OF THE ISSUES................................................................2

STATEMENT OF THE CASE...................................................................3

    I.    Course of Proceedings and Disposition Below ....................................3

    II.    Statement of Facts ........................................................................4

        A.    The Reynoldses and Their Companies .......................................4

        B.    The Conservation Easement Donation on the Subject
            Property ............................................................................9

        C.    Evidence of Highest-and-Best Use ...........................................12

STANDARD AND SCOPE OF REVIEW .................................................13

SUMMARY OF ARGUMENT ................................................................14

ARGUMENT AND CITATIONS OF AUTHORITY ...............................15

    I.    The Tax Court Misconstrued the Rules of Evidence .........................15

    II.    The Tax Court Misinterpreted the Internal Revenue Code................24

        A.    The Court misconstrued the requirement of a qualified
            appraiser ..........................................................................24

        B.    The Court erred in interpreting the reasonable cause
            defense ............................................................................29

        C.    The Court misconstrued the term "inventory"...........................30

            1.    Separate corporate entities are treated separately..........31

2.   Inventory means property held for sale in the ordinary course of business ........................................................32

3.   The inventory rules do not apply to the donation of a partial interest in real estate ............................................36

4.   Oconee substantiated its basis .........................................38

III.   The Court Erred in Valuing the Charitable Deduction ......................38

A.   The Court erred in disregarding relevant evidence establishing fair market value ....................................................39

B.   The Court misapplied the highest-and-best use analysis..........41

C.   The Court erred in striking an expert report .............................46

D.   The Court erred by using a comparable-sales analysis without comparable sales ............................................................48

IV.   Penalties Could Not Be Imposed .......................................................56

CONCLUSION ....................................................................................................56

CERTIFICATE OF COMPLIANCE ....................................................................58

CERTIFICATE OF SERVICE ..............................................................................59

## <u>TABLE OF CITATIONS</u>

**Page(s)**

**Cases:**

*Adu v. U.S. Att'y Gen.*,
  785 F. App'x 776 (11th Cir. 2019) .......................................40

*Am. Soc'y of Composers, Authors & Publishers v. Showtime/*
  *The Movie Channel, Inc.*,
  912 F.2d 563 (2d Cir. 1990) ................................................51

*Anchor Sav. Bank, FSB v. United States*,
  597 F.3d 1356 (Fed. Cir. 2010) ..........................................50

*Applebaum v. Target Corp.*,
  831 F.3d 740 (6th Cir. 2016) ..............................................18

*Bazemore v. Friday*,
  478 U.S. 385 (1986).............................................................40

*Beech Aircraft Corp. v. Rainey*,
  488 U.S. 153 (1988).............................................................31

*Bexar Plumbing Co. v. NLRB*,
  536 F.2d 634 (5th Cir. 1976) ..............................................40

*BFP v. Resol. Tr. Corp.*,
  511 U.S. 531 (1994)..................................................... 50, 51

*Bonner v. City of Prichard*,
  661 F.2d 1206 (11th Cir. 1981) ..........................................31

*Boree v. Comm'r*,
  837 F.3d 1093 (11th Cir. 2016) .................................... 29, 33

*Boysen v. Ill. Tool Works Inc. Separation Pay Plan*,
  767 F. App'x 799 (11th Cir. 2019) ......................................40

*Brannen v. Comm'r*,
  722 F.2d 695 (11th Cir. 1984) ............................................32

iv

*Campbell v. Prothro*,
   209 F.2d 331 (5th Cir. 1954) ................................................................36

*Cave Buttes, LLC v. Comm'r*,
   147 T.C. 338 (2016)............................................................................53

*Champions Retreat Golf Founders, LLC v. Comm'r*,
   959 F.3d 1033 (11th Cir. 2020) .........................................................13

*Corning Place Ohio, LLC v. Comm'r*,
   T.C. Memo. 2022-12...........................................................................29

*Crimi v. Comm'r*,
   T.C. Memo. 2013-51...........................................................................29

*Cunningham v. Masterwear Corp.*,
   569 F.3d 673 (7th Cir. 2009) .............................................................55

*DAGS II, LLC v. Huntington Nat'l Bank*,
   865 F.3d 384 (6th Cir. 2017) .............................................................50

*Davis v. Comm'r*,
   T.C. Memo. 2015-88...........................................................................53

*Est. of Jelke v. Comm'r*,
   507 F.3d 1317 (11th Cir. 2007) .........................................................14

*Est. of Watts v. Comm'r*,
   823 F.2d 483 (11th Cir. 1987) ...........................................................53

*Estate of Newhouse v. Comm'r*,
   94 T.C. 193 (1990).............................................................................53

*Fahs v. Crawford*,
   161 F.2d 315 (5th Cir. 1947) .............................................................35

*Friedberg v. Comm'r*,
   T.C. Memo. 2013-224.........................................................................28

*FTC v. AbbVie Prods. LLC*,
   713 F.3d 54 (11th Cir. 2013) .............................................................41

*Glade Creek Partner, LLC v. Comm'r,*
  No. 21-11251, 2022 WL 3582113 (11th Cir. Aug. 22, 2022) ............................42

*Gross v. Comm'r,*
  T.C. Memo 1999-254 ...............................................................47

*Gustashaw v. Comm'r,*
  696 F.3d 1124 (11th Cir. 2012) ...................................................29

*Haynsworth v. United States,*
  47 A.F.T.R.2d 81 (Ct. Cl. 1981) ...................................................34

*Homan & Crimen, Inc. v. Harris,*
  626 F.2d 1201 (5th Cir. 1980) ....................................................31

*In re Oil Spill,*
  No. 2179, 2012 WL 85447 (E.D. La. Jan. 11, 2012) ..................................18

*In re Steffen,*
  342 B.R. 861 (Bankr. M.D. Fla. 2006) .............................................51

*In re Williams,*
  480 B.R. 813 (E.D. Tenn. 2012) ...................................................50

*Jackson Crossroads, LLC v. Comm'r,*
  T.C. Memo. 2024-111 ..............................................................27

*Jean v. Nelson,*
  711 F.2d 1455 (11th Cir. 1983) ...................................................40

*Johnson v. Thibodaux City,*
  887 F.3d 726 (5th Cir. 2018) .....................................................47

*Kaufman v. Comm'r,*
  T.C. Memo. 2014-52 ...............................................................24

*Keene Corp. v. United States,*
  508 U.S. 200 (1993) ..............................................................37

*Latecoere Int'l, Inc. v. U.S. Dep't of the Navy,*
  19 F.3d 1341 (11th Cir. 1994) ....................................................40

*Long v. Comm'r*,
    772 F.3d 670 (11th Cir. 2014) ........................................................ 15, 36

*Mahon v. U.S. Dep't of Agric.*,
    485 F.3d 1247 (11th Cir. 2007) ............................................................40

\*Marjam Supply Co. of Fla. v. Pliteq, Inc.,
    812 F. App'x 803 (11th Cir. 2020) .......................................................17

*Mickell v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*,
    832 F. App'x 586 (11th Cir. 2020) .......................................................40

*Mill Rd. 36 Henry, LLC v. Comm'r*,
    T.C. Memo. 2023-129...........................................................................25

*Miss. & Rum River Boom Co. v. Patterson*,
    98 U.S. 403 (1878)...............................................................................41

\*Moline Props. v. Comm'r,
    319 U.S. 436 (1943)..............................................................................31

*Neonatology Assocs., P.A. v. Comm'r*,
    115 T.C. 43 (2000)...............................................................................29

*Olson v. United States*,
    292 U.S. 246 (1934)..............................................................................41

\*Palmer Ranch Holdings Ltd. v. Comm'r,
    812 F.3d 982 (11th Cir. 2016) ...................................................... 41, 56

*Palmer v. Hoffman*,
    318 U.S. 109 (1943)..............................................................................22

*Pearson v. Ga. ex rel. Davis*,
    806 F. App'x 940 (11th Cir. 2020) .......................................................17

*Pine Mountain Pres., LLLP v. Comm'r*,
    978 F.3d 1200 (11th Cir. 2020) ............................................................38

*Pine Mountain Pres., LLLP v. Comm'r*,
    T.C. Memo. 2018-214...........................................................................53

*Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC*,
   777 F.3d 1187 (11th Cir. 2014) ............................................................50

*Resol. Tr. Corp. v. Carr*,
   13 F.3d 425 (1st Cir. 1993) ..................................................................51

*Russello v. United States*,
   464 U.S. 16 (1983) ...............................................................................37

*S. Grande View Dev. Co. v. City of Alabaster*,
   1 F.4th 1299 (11th Cir. 2021) ..............................................................44

*Scheidelman v. Comm'r*,
   682 F.3d 189 (2d Cir. 2012) .................................................................28

*Seabrook Prop., LLC v. Comm'r*,
   T.C. Memo. 2025-6.................................................................................27

*Sharp v. United States*,
   191 U.S. 341 (1903)..............................................................................55

*Smith v. Dunn*,
   224 F.2d 353 (5th Cir. 1955) ...............................................................34

*Symington v. Comm'r*,
   87 T.C. 892 (1986)................................................................................42

*T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.*,
   931 F.2d 816 (11th Cir. 1991) .............................................................19

*Transwestern Pipeline Co. v. O'Brien*,
   418 F.2d 15 (5th Cir. 1969) ...........................................................44, 50

*Trout Ranch LLC v. Comm'r*,
   T.C. Memo. 2010-283............................................................................47

*United States v. 0.161 Acres of Land*,
   837 F.2d 1036 (11th Cir. 1988) ...........................................................50

*United States v. 320.0 Acres of Land*,
   605 F.2d 762 (5th Cir. 1979) ...............................................................44

*United States v. 79.75 Acres of Land*,
    459 F.2d 185 (10th Cir. 1972) ...............................................................50

*United States v. 87.98 Acres of Land*,
    530 F.3d 899 (9th Cir. 2008) .................................................................48

*United States v. Aguirre-Rodriguez*,
    762 F. App'x 956 (11th Cir. 2019) ........................................................19

*United States v. Ary*,
    518 F.3d 775 (10th Cir. 2008) ....................................................... 20, 22

*United States v. Blechman*,
    657 F.3d 1052 (10th Cir. 2011) .............................................................20

*United States v. Boyle*,
    469 U.S. 241 (1985)..............................................................................29

*United States v. Browne*,
    834 F.3d 403 (3d Cir. 2016) .................................................................22

*United States v. Causby*,
    328 U.S. 256 (1946)..............................................................................41

*United States v. Clotaire*,
    963 F.3d 1288 (11th Cir. 2020) .............................................................17

*United States v. Cone*,
    714 F.3d 197 (4th Cir. 2013) .................................................................18

*United States v. Daneshvar*,
    925 F.3d 766 (6th Cir. 2019) .................................................................18

*United States v. Easements & Rights-of-Way Over a Total of 15.66
Acres of Land*,
    779 F. App'x 578 (11th Cir. 2019)........................................................44

*United States v. Kachkar*,
    No. 19-12685, 2022 WL 2704358 (11th Cir. July 12, 2022) .................17

*United States v. Knowles*,
    889 F.3d 1251 (11th Cir. 2018) .............................................................47

*United States v. Lischewski*,
  860 F. App'x 512 (9th Cir. 2021) ...........................................................................18

*\*United States v. Michener*,
  152 F.2d 880 (3d Cir. 1945) ........................................................................ 16, 24

*United States v. Penn*,
  568 F. Supp. 3d 1135 (D. Colo. 2021)....................................................................21

*United States v. Smith*,
  355 F.2d 807 (5th Cir. 1966) ..............................................................................55

*United States v. Williams*,
  837 F.2d 1009 (11th Cir. 1988) ........................................................................19

*United States v. Winthrop*,
  417 F.2d 905 (5th Cir. 1969) ..............................................................................33

*Westfed Holdings, Inc. v. United States*,
  55 Fed. Cl. 544 (2003) .......................................................................................18

*Woodsum v. Comm'r*,
  136 T.C. 585 (2011).............................................................................................30

**Statutes:**

26 U.S.C. § 170 .................................................................................. 24, 29

26 U.S.C. § 724 ...................................................................................................36

26 U.S.C. § 1221 .................................................................................................32

26 U.S.C. § 6226 ...................................................................................................2

26 U.S.C. § 7453 .................................................................................................15

26 U.S.C. § 7482 ...................................................................................................2

**Regulations:**

Treas. Reg. § 1.170A-1 .......................................................................................53

Treas. Reg. § 1.170A-13 .....................................................................................24

Treas. Reg. § 1.170A-14 ................................................................ 36, 39, 41

**Rules:**

Fed. R. Evid. 602 ...........................................................................15

Fed. R. Evid. 803 ...................................................................... 17, 18

Fed. R. Evid. 805 ...........................................................................19

Fed. R. Evid. 901 ...........................................................................15

Fed. R. Evid. 902 ...........................................................................22

**Other Authorities:**

*Bogdanski*, Federal Tax Valuation § 3.02 ................................................53

Rev. Proc. 74-29 ...........................................................................50

S. Rep. No. 96-1007 (June 12, 1980) .................................................. 37. 41

## INTRODUCTION

Any trial attorney would be confused by what happened in this case. At the beginning of trial, the Tax Court admitted into evidence (over Oconee's objections) 553 of the IRS' exhibits before a single witness had been called. Among other things, the Court reasoned that no foundation witness (with personal knowledge of what each document purported to show) was necessary. The Court also held that emails are necessarily business records and are admissible without any witness testifying about them. That is not the way trials work. Nor is it fair to the party who has no idea why documents are being admitted or what the opposing party believes that those documents mean.

Based on the way evidence was admitted, it is difficult to determine the basis for the Court's subsequent findings and conclusions. Nevertheless, in its opinion, the Court ignored the overwhelming admissible evidence on the highest-and-best use of the property at issue, the value of the property, and the requirement of supporting a deduction with a qualified appraiser. The Court did not explain why it ignored credible evidence or what evidence, if any, it actually relied upon in rendering its decision.

What we do know is, to reach its conclusion, the Court made several novel interpretations of the Internal Revenue Code. Whether based on those legal errors or the misapplication of the law to the facts, the Court's decision should be reversed.

## **STATEMENT OF JURISDICTION**

The Tax Court had jurisdiction pursuant to 26 U.S.C. § 6226 to review the Final Partnership Administrative Adjustment issued to Oconee. This Court has jurisdiction under 26 U.S.C. § 7482(a)(1) to review the Tax Court's final decision entered October 10, 2024. Oconee timely appealed on January 3, 2025. Venue is proper in this Court under 26 U.S.C. § 7482(b) because Oconee's principal place of business is in Georgia.

## **STATEMENT OF THE ISSUES**

Oconee donated a conservation easement that forever restricted its ability to develop 355 acres of land near Lake Oconee. The Tax Court held that Oconee was not entitled to a tax deduction for that donation and that Oconee should be penalized for claiming the deduction. The issues on appeal are:

1) Whether the Court erred in admitting exhibits *en masse*, without a foundation witness;

2) Whether the Court erred in interpreting Section 170 of the Internal Revenue Code;

3) Whether the Court erred in misconstruing the property's highest-and-best use and deciding that the donated property had minimal value; and

4) Whether the Court erred in imposing penalties.

## STATEMENT OF THE CASE

### I.    Course of Proceedings and Disposition Below

The Property at issue is approximately 355 acres near Lake Oconee surrounded by a Ritz Carlton lakefront resort, an active senior community, and multiple gated luxury golfing neighborhoods.  (Doc.16-1 pp. 13-14).[1]

The Property used to be part of a larger parent tract.  In 2007, three entities owned by the Mercer Reynolds family sold 407 acres of that parent tract to Del Webb (a national developer) for $20.3 million.  (Doc.15-8 p. 381).  In 2015, Oconee (also managed by the Reynoldses) donated a perpetual conservation easement on its Property and reported a $20,670,000 charitable deduction for the donation on its tax return.  (Doc.8-19 p. 21).

However, the IRS disfavors conservation easements and therefore disallowed the deduction.  (Doc.8-19 pp. 35-52).  Oconee challenged the disallowance in Tax Court.  (Doc.8-2 pp. 1-27).

After a bench trial, the Court held that the Property had little value, completely disallowed any deduction, and determined that Oconee should be penalized for claiming the deduction.  (Doc.15-14 pp. 781-858, 973-74).

Oconee timely appealed.  (Doc.15-14 pp. 975-78).

---

[1] Factual citations are generally to this Court's record and volume followed by page number(s).  However, some documents appear to have been omitted from the record on appeal.  Oconee will include any missing cited documents in its appendix.

II.    **Statement of Facts**

A.    **The Reynoldses and Their Companies**

Many Georgians are familiar with the Ritz Carlton area on Lake Oconee as well as the financial rise and fall of Linger Longer Development Company and its owners, the Mercer Reynolds family. The Reynoldses (longtime residents of Greene County, Georgia) formed Linger Longer in 1987. (Doc.8-19 p. 11). Linger Longer developed six golf courses, a Ritz Carlton Hotel, a health club, a fitness club, several marinas, and 40-50 miles of roads in the area. (Doc.16-3 pp. 130-34). Linger Longer also developed Reynolds Lake Oconee (a gated community of premier homes) and Great Waters (the community where the Jack Nicklaus golf course is located). (Doc.16-3 pp. 131-32, 135, 378-79).

Linger Longer developed properties at different price points for different markets. Some lots were cottage interior lots, some were golf course lots, some were lake access lots, and some were lakefront lots. (Doc.16-3 p. 135). However, the golf community and lakefront lots exceeded price points that middle-income individuals could afford.

Aside from the properties Linger Longer developed, the Reynoldses also held property in investment entities. (Doc.16-3 p. 164). When development became imminent, property was sold to Linger Longer. (Doc.16-3 p. 241).

4

Reynolds Partners was one such investment entity. It was created in 1987 and invested in restaurants, private equity, and real estate. (Doc.16-3 pp. 251-52, 681; *see also* Doc.8-19 p. 79). In 2003, Reynolds Partners and James ("Jamie") M. Reynolds, III each purchased a one-half interest in 1,130 acres in Greene County (the "Parent Tract"). (Doc.8-19 pp. 12-13, 102-10).

As the resort and luxury golfing communities expanded, Linger Longer intended to build out a variety of housing options. (Doc.12-5 pp. 8-97). Greene County welcomed the expanded housing options and facilitated the potential development of the Parent Tract by granting Linger Longer's requested zoning change to Commercial Planned Unit Development ("CPUD") for the total 1,733 acres owned. (Doc.8-19 p. 20; Doc.12-3 p. 9; Doc.12-5 pp. 7-97; Doc.16-3 p. 265).

In 2006, Linger Longer hired Robert Charles Lesser & Co., LLC ("RCLCo") to prepare a feasibility study and advise on the types of development the local market would absorb. (Doc.8-26 p. 385; Doc.12-3 p. 9; Doc.16-3 pp. 139-40, 267-68). The RCLCo study confirmed that a mixed-use development (including commercial buildings and both multi-family and single-family residential homes) was possible. (Doc.12-3 pp. 26-27). RCLCo determined that middle-market housing was the highest-and-best use of the Parent Tract, with a town center and additional amenities. (Doc.12-3 pp. 55-59; Doc.12-4 p. 1; Doc.12-5 pp. 1-3). Linger Longer also hired

Urban Design Associates to design a master planned community called "Reynoldsboro," consistent with the RCLCo study:



(Doc.12-1 p. 29; Doc.16-3 pp. 146, 266-72).

Unfortunately, the financial crisis hit.  While Linger Longer continued to sell lots at the start of the recession, by May 2011, Linger Longer and other Reynolds entities were forced into receivership.  (Doc.8-26 p. 395; Doc.12-5 pp. 272-662).  In

6

2012, much of the real estate Linger Longer owned was sold out of receivership to a subsidiary of Metropolitan Life Insurance Company ("Met Life").  (Doc.8-26 p. 395; Doc.16-3 pp. 141-42).  Linger Longer was not granted an Order of Final Discharge of Receiver until November 2018.  (Doc.12-5 pp. 663-67).

After the sale to Met Life, members of the Reynolds family had no direct or indirect ownership of any significant real estate in Greene County other than the Parent Tract.  (Doc.8-26 p. 396).  Still, the Parent Tract was prime commercial, mixed-use property. (Doc.16-1 pp. 9, 15-20).  The main commercial thoroughfare through the area, Highway 44, runs along the side of the Parent Tract, and Carey Station Road runs through the Parent Tract:



(Doc.12-5 p. 95). The Parent Tract was the best located property at Lake Oconee from a commercial perspective and had many potential uses. (Doc.16-4 p. 566).

After the sale of Linger Longer's assets, the Reynoldses (and related entities) continued to owe money to several banks including PNC and Farmers Bank. (Doc.16-3 p. 141). It was well known that the Reynoldses were having financial difficulties. (Doc.16-4 pp. 369, 765-66; Doc.15-9 p. 59). The Reynoldses' credit grade was 14, indicating that the loan on the Parent Tract was a distressed loan and that there was a high probability of default. (Doc.16-4 p. 782; Doc.13-5 p. 250).

8

Once Linger Longer's assets were sold, Reynolds Development Management Group was formed to explore developing the Parent Tract with a joint venture partner.  (Doc.8-19 p. 127; Doc.16-3 p. 279).  Mercer Reynolds believed the development would generate a significant return and be worth hundreds of millions of dollars upon completion.  (Doc.16-3 pp. 145, 156-57).  But he needed help.  His wife had developed health issues, and he assisted with her care.  (Doc.16-3 p. 721).  The Reynoldses needed cash to both pay off debt and to develop the Parent Tract.  (Doc.16-3 pp. 140-41, 150, 279, 281-82).

A joint venture would involve the Reynoldses contributing the land and the new partner contributing the financial capital.  (Doc.16-3 pp. 144-45, 281).  Mike Kelly, the former head of development for Linger Longer, unsuccessfully sought such a partner.  (Doc.16-3 pp. 280-81).  For example, Phoenix Capital approached the Reynoldses about either purchasing the Parent Tract or entering a joint venture.  (Doc.16-3 p. 143).  However, negotiations broke down over how cashflow would be shared.  (Doc.16-3 p. 283).  Similarly, the TPA Group approached the Reynoldses about a joint venture, but they were unable to reach a deal.  (Doc.16-3 p. 145).

### B.    The Conservation Easement Donation on the Subject Property

Reynolds Partners and Jamie Reynolds held the Parent Tract together until October 2014, when they transferred 980 acres to Carey Station, LLC.  (Doc.8-19 pp. 17-18; 246-48).  In December 2014, Carey Station contributed the Property

9

(approximately 355 acres) to Oconee Landing Property, LLC. (Doc.8-19 pp. 21, 720-30). The balance of the Parent Tract was transferred to two other entities that subsequently donated to land trusts.[2] (Doc.8-26, 403, 405-06, 408).

The Reynoldses eventually hired Todd Ciavola, a local real estate professional, to help them identify options for monetizing the Property. (Doc.16-4 p. 182). Ciavola introduced them to Strategic Capital Partners, an Atlanta-based consulting firm that assists clients in raising private equity for real estate transactions and manages funds in real estate and traditional private equity. (Doc.15-9 pp. 57-58). The Reynoldses wanted to know what a joint venture transaction would mean for them,[3] so Strategic provided estimated costs for various scenarios. (Doc.16-4 pp. 240-41, 265, 268). Strategic was hired in May 2015 to analyze potential uses for the Property and raise capital. (Doc.16-4 p. 183; Doc.15-9 p. 69). One of Strategic's principals, Ricky Novak, has been involved in real estate since graduating from law school and as part of his training received a certificate from Yale University's conservation finance program. (Doc.15-9 p. 49).

---

[2] Unrebutted testimony at trial confirmed that these donations would have no impact on the valuation of the Property. (Doc. 15-8 pp. 976-77).

[3] In March 2015 Ciavola sent an email to the Reynoldses estimating their recovery if they proceeded with Strategic. (Ex. 714-R). Notably, nobody from Strategic was included on this email, as Strategic had not even been engaged. Strategic was not aware that the Reynoldses had any amount in mind before moving forward with the subsequent transaction. (Doc. 16-4 pp. 217, 269; Doc. 12-9 pp. 19-20).

Strategic worked with Ciavola to understand potential uses of the Property. (Doc.16-4 p. 185).  The Reynoldses had both debt and an asset they wanted to monetize.  The property was entitled for mixed-use development and an attractive target for investors.  However, because of the receivership, their negotiating position was slim.  Strategic facilitated due diligence on a development option for the Property as well as a potential conservation option.  (Doc.16-4 pp. 186-87).

Regardless of the option chosen, Oconee had three secondary business strategy assets.  (Doc.15-9 p. 75).  First, it invested $500,000 in the Strategic Real Estate Opportunity Fund ("SREOF"), which further invested in multiple real estate assets.  (Doc.15-9 p. 75).  SREOF produced a 40-50% return over its life.  (Doc.16-3 p. 192).  Second, Oconee had a separate investment of $250,000 in a real estate fund that the Reynoldses directed.  (Doc.15-9 p. 76).  Third, Oconee had the value of the Property itself, which would of course significantly diminish under the conservation option.  (Doc.15-9 p. 77).

Strategic reiterated to the Reynoldses that no value for the Property could be determined until independent appraisers finished their appraisal.  (Doc.16-4 p. 216; Doc.15-9 p. 88).  Mercer Reynolds knew of the 2007 sale to Del Webb for $20.3 million and estimated the value of the remaining acreage at "a couple hundred million dollars."  (Doc.15-8 p. 381; Doc.16-3 p. 156).

11

Strategic eventually received a verbal number from the appraisers and a written restricted appraisal report in December 2015. (Doc.16-4 p. 236; Doc.8-19 pp. 19-20; Doc.8-18 pp. 328-441; Doc.15-9 pp. 87-89; Doc.12-9 pp. 32-35).

Rather than pursue development of the Property, Oconee's investors voted to pursue the conservation option. (Doc.13-1 p. 99; Doc.12-9 pp. 114-26). Oconee executed a Deed of Conservation Easement with Georgia Alabama Land Trust, Inc. on December 31, 2015. (Doc.8-19 pp. 24-25; Doc.8-20 pp. 137-75). At the time of the donation, the Property was not encumbered by any debt. (Doc.8-19 p. 26).

The Greene County Board of Commissioners confirmed that, because of the conservation easement, the entitlements allocated to the Property were given up irrevocably. (Doc.8-20 pp. 177-78).

### C.    Evidence of Highest-and-Best Use

At trial, witnesses explained that there was no workforce housing for people who work in the area. (Doc.16-3 pp. 509, 548, 690). Ted Whitmer, the only USPAP expert at trial, confirmed the same. (Doc.16-4 p. 487). The Property's highest-and-best use was housing for those individuals, along with associated commercial uses. The Property had been zoned CPUD to accommodate housing alternatives such as condominiums, townhomes, and apartments. (Doc.12-5 p. 95). According to land planner Rick McAllister, such a community was physically possible. (Doc.15-8 pp. 3-30). Oconee's appraisal and market analysis experts, as well as multiple lay

12

witnesses (including the Greene County Manager) confirmed the need for housing options.  (Doc.15-11 pp. 87-88, Doc.16-1 p. 38; Doc.15-8 pp. 112, 429-30, 1002; Doc.16-3 p. 370; Doc.16-4 p. 487; Doc.15-9 p. 172).  And the Property is surrounded by water, sewer, electricity, and other utilities, making it "shovel-ready."  (Doc.8-26 pp. 384-85)

On the other hand, an IRS appraiser claimed that the Property could only be held for long-term development of luxury homes.  (Doc.15-6 p. 523; Doc.15-7 p. 65).  He surmised that since lake lots and golfing community lots were already available, it would not be financially feasible to develop the Property into luxury homes. (Doc.15-7 pp. 37-38, 47, 65, 67-68). The IRS appraiser did not base his opinion on any feasibility studies, discussions with local experts or local community officials, or any outside marketing sources.

The Court denied Oconee's request for the Court to visit the Property and the surrounding area.  (Doc.16-3 p. 5).

## STANDARD AND SCOPE OF REVIEW

This Court reviews "the Tax Court's legal conclusions de novo and its factual findings for clear error."  *Champions Retreat Golf Founders, LLC v. Comm'r*, 959 F.3d 1033, 1035 (11th Cir. 2020).  "The question of whether the Tax Court used the correct standard to determine fair market value is a legal issue," and this Court

reviews "de novo the Tax Court's rulings on the interpretation and application of the tax code." *Est. of Jelke v. Comm'r*, 507 F.3d 1317, 1320 (11th Cir. 2007).

## SUMMARY OF ARGUMENT

In a novel approach to trial procedure, the Court determined that a party "may not properly argue that an authentic, otherwise-unobjectionable document 'lacks a foundation' in and of itself." (Dkt. 238). This ruling was one basis for admitting hundreds of disputed exhibits *en masse*. Exacerbating the problem, the Court broadened the scope of exceptions to the hearsay rule to avoid having live testimony. If this practice were allowed to stand, then there would no longer be a need for witnesses. This Court should reverse and hold that the time-honored tradition of live witness testimony is worthwhile.

Further, the Court created new interpretations of several provisions of the Internal Revenue Code—provisions related to the qualifications of an appraiser who values a charitable deduction, a taxpayer's defenses to the disallowance of a deduction, and the meaning of "inventory." These errors also warrant reversal.

Additionally, the Court ignored evidence (including unrebutted expert evidence) demonstrating the value of the deduction. And rather than address the Property's true highest-and-best use, the Court relied on distressed sales and liquidation values to conclude that the donation had minimal value. This, too, was error.

14

Finally, because of the errors described above, the Court erred in imposing penalties.

For all these reasons, this Court should reverse.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    The Tax Court Misconstrued the Rules of Evidence.

The Federal Rules of Evidence apply to Tax Court proceedings. *Long v. Comm'r*, 772 F.3d 670, 679 (11th Cir. 2014); *see also* 26 U.S.C. § 7453.

Normally, evidence is introduced through a witness with personal knowledge of what the evidence purports to be.  Fed. R. Evid. 602, 901.  Documents (such as emails) are introduced through witnesses as impeachment or to refresh recollection. That a foundation witness is necessary is confirmed by the rules disallowing evidence relating to unavailable witnesses except under specific circumstances.  A proponent of written evidence must satisfy the requirements of foundation and relevance and show that the document is not hearsay.

Even communications that might be excepted from the hearsay rule are introduced through a witness.  Normally, either the speaker or the recipient testifies about the nature of the communication.  What was the context?  Is a document the complete communication?  Were there additional discussions?  Most factfinders *want* to hear from witnesses to understand the evidence.

15

But here, the Court determined that no foundation witness was necessary if a communication had anything to do with Oconee, its investors, or its consultants. (Doc.16-3 pp. 81-82). In addition, the Court broadened the scope of the "business records" exception to the hearsay rule to include any documents within a company's file. (Doc.15-5 pp. 107-10). The Court then admitted hundreds of exhibits into evidence—in bulk. (Doc.16-3 pp. 40-81). These included documents from third parties relating to other transactions of other partnerships and purported business records of various third parties. The Court overruled Oconee's objections and admitted all the exhibits into evidence without the testimony of any witness with personal knowledge of the documents' contents.

That was improper. The Third Circuit decried a similar approach when a trial court "admitted into the evidence all of the corporate records which were present in the court room." *United States v. Michener*, 152 F.2d 880, 885 (3d Cir. 1945). Some of the documents had been discussed during the trial; others had not been mentioned at all. *Id.* And many contained notations and remarks that had not been vetted through a witness. *Id.* The court found it "difficult to understand" how such bulk admission could assist in "reaching a sound, clearcut decision as to the facts in this case." *Id.* Regardless of the hearsay and relevance objections to each individual document, the court said it was "unable to approve of such indiscriminate depositing of masses of corporate records into the evidence." *Id.*

16

So too here.[4]  The Court erred in admitting hundreds of exhibits without requiring any sort of showing as to foundation, relevance, or hearsay.

Nor did the IRS, as the proponent of the exhibits, meet its burden.  For example, to come within the business records exception, the IRS bore the burden of showing that the exception applied.  Fed. R. Evid. 803(6).  These requirements are strictly enforced.  *See, e.g.*, *Marjam Supply Co. of Fla. v. Pliteq, Inc.*, 812 F. App'x 803, 810-11 (11th Cir. 2020); *Pearson v. Ga. ex rel. Davis*, 806 F. App'x 940, 951 (11th Cir. 2020).  Because the IRS did not demonstrate that the documents "were kept for future, business-related reference," it did not meet its burden.  *See United States v. Kachkar*, No. 19-12685, 2022 WL 2704358, at *7 (11th Cir. July 12, 2022) (affirming exclusion).

Many of the admitted documents were emails, which are not exempted from the hearsay rule simply because a business uses that form of communication.  *See, e.g.*, *United States v. Clotaire*, 963 F.3d 1288, 1297 (11th Cir. 2020).  Indeed, this Court has said that emails are *not* necessarily records of a regularly conducted business activity.  *Kachkar*, 2022 WL 2704358, at *7; *Pearson*, 806 F. App'x at 951; *Marjam Supply Co. of Fla. v. Pliteq, Inc.*, 812 F. App'x 803, 810-11 (11th Cir. 2020).

---

[4] Ordinarily, Oconee would identify the specific documents that were improperly admitted.  However, the Court admitted hundreds of exhibits simultaneously, without discussing particular documents in its subsequent opinion.  Thus, Oconee has no way to identify the exhibits on which the Court relied.

17

Otherwise, "base hearsay could be transformed into admissible evidence whenever organizations corresponded with each other, indeed with one click on a computer screen in some instances." *Applebaum v. Target Corp.*, 831 F.3d 740, 744 (6th Cir. 2016); *see also In re Oil Spill*, No. 2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012). Such "documents that are created solely at the author's discretion raise motivational concerns and lack the reliability and trustworthiness that business records are ordinarily assumed to have." *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 566-67 (2003), *aff'd in part, rev'd in part*, 407 F.3d 1352 (Fed. Cir. 2005). Emails "do not have the formality of business purpose that appears to have been contemplated" by the exception. *Id.*; *see also United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019); *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013). The exception is premised on the notion that business records are reliable due to "systematic checking." Fed. R. Evid. 803(6) advisory committee note. An email chain, by itself, does not have such indicia of reliability; there is no systematic checking and no duty to make a factually accurate email.

To be sure, an email *may* come within the exception if the proper foundation is established. *See, e.g.*, *United States v. Lischewski*, 860 F. App'x 512, 516 (9th Cir. 2021). But the Court was incorrect to assume that all emails in a company's email system are automatically records of a regularly conducted business activity.

The Court also erred in disregarding the IRS' burden. This Court has ruled that Rule 803(6) "requires that a record custodian testify in court about the creation and maintenance of the business record." *United States v. Aguirre-Rodriguez*, 762 F. App'x 956, 958 (11th Cir. 2019); *see also United States v. Williams*, 837 F.2d 1009, 1013 n.6 (11th Cir. 1988) (explaining that the government might have satisfied the exception "if it had introduced the testimony of a witness with personal knowledge"). But here, the IRS called no witness to lay a proper foundation for the purported business records.

If this approach were permitted, a party could introduce innumerable documents as "business records" and then argue whatever it wanted based on its interpretation of the documents. That is a novel approach to trial procedure indeed.

Moreover, many of the documents contained double hearsay. *See* Fed. R. Evid. 805 (explaining that "[h]earsay within hearsay" must fit within an exception). Statements in the documents (themselves hearsay) contained hearsay from *other* individuals. To be a record of a regularly conducted business activity, "all persons involved in the process must be acting in the regular course of business—otherwise, an essential link in the trustworthiness chain is missing." *T. Harris Young & Assocs., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 828 (11th Cir. 1991). "If the person who provides the information is an outsider to the business who is not under a business duty to provide accurate information, then the reliability rationale that underlies the

19

business records exception ordinarily does not apply." *United States v. Blechman*, 657 F.3d 1052, 1065 (10th Cir. 2011). That is, "[i]f information is provided by another person who is an outsider to the business preparing the record, those statements must also fall within a hearsay exception to be admissible." *United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008). The IRS did not make that showing here.

For example, the Court erroneously admitted into evidence (for the truth of the matters asserted therein) three appraisals as purported business records of banks. (Doc.16-3 pp. 47-48, 62). The Court admitted these appraisals, over Oconee's objection, as evidence of highest-and-best use and fair market value ("FMV") without requiring the IRS to offer any testimony from the banks or any of the appraisers regarding the nature of the appraisals.

As another example, the Court admitted several emails from Mike Kelly. (*See* Doc.12-5 pp. 187-90. 214-18, 238-42). The IRS did not ask Kelly any questions at trial, and no one testified that the emails were intended to show the FMV of the Property. Yet, the Court apparently assumed that the numbers fed into an Excel spreadsheet determined value even though the testimony showed that Mercer Reynolds and Kelly inputted assumptions into an Excel financial model to produce numbers they could use when considering a joint venture. (Doc.16-3 p. 284; Doc.16-4 pp. 606, 622). Kelly provided the assumptions to financial analyst Scott Denbow to create various spreadsheets to structure a deal, but none of the spreadsheets had

20

anything to do with FMV.  (Doc.16-3 pp. 184-85, 297; Doc.16-4 pp. 185, 291-92).

Kelly was not using comparable sales.  (Doc.16-4 p. 622).  Neither Kelly nor

Denbow is an appraiser.  (Doc.16-3 p. 299; Doc.16-4 p. 622).  The emails simply

related to assumptions plugged into a spreadsheet for negotiation purposes.

(Doc.16-3 pp. 184-85).

Rather than rely on witness testimony, the Court accepted ten business records

certifications and assumed that all documents referenced in those documents were

admissible.  (Doc.12-14 pp. 853, 867, 869, 878, 1023-26, 1028-29, 1046-55;

Doc.15-5 pp. 577-94). Contrary to the Court's assumption, there is not a general

exception for "typical written conversations between two or more people in the

context of running a business." *United States v. Penn*, 568 F. Supp. 3d 1135, 1142

(D. Colo. 2021).  The certifications proffered by the IRS made the conclusory

statement that each document was made during a regularly conducted activity, but

what activity?  When was the record made?  How was the record a regular practice

of that activity?  Who made the record, and what information did they have?  Was

the record based on the authors' personal knowledge, or based on something that

they were told, or something they were given or read?  And, how did the purported

custodians have personal knowledge of these facts to enable them to declare the

things they said were true?  The certifications did not answer any of these questions.

Nor did they show "that each actor in the chain of information [was] under a business

duty or compulsion to provide accurate information"—which is an "essential component" of the necessary showing. *United States v. Ary*, 518 F.3d 775, 787 (10th Cir. 2008). Simply providing a disputed certification, from an individual who does not have any personal knowledge, is not enough.

Even if the certifications had met the requirements, "[a]t most" they could "attest to the accuracy of only certain aspects of the communications exchanged," including that the communications took place "on particular dates, or at particular times." *United States v. Browne*, 834 F.3d 403, 410-11 (3d Cir. 2016). A certification that a document is an email is not the same as a certification that the email's contents are true. *See* Fed. R. Evid. 902 advisory committee note ("A certification under this Rule can only establish that the proffered item is authentic."). "In fact, the [Tax Court's] position would mean that all electronic information whose storage or transmission could be verified by a third-party service provider would be exempt from the hearsay rules—a novel proposition indeed." *Browne*, 834 F.3d at 411; *see also Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943).

For example, the IRS relied on a business records certification from a law firm's general counsel to admit more than 100 documents the law firm did not create. (Doc.12-14 pp. 1046-55). The general counsel had no involvement in the underlying transaction, was not mentioned in the documents, and could not speak to why they were in the law firm's file. Yet, the Court admitted all of the documents without

22

requiring the IRS to lay a proper foundation.  (Doc.16-3 p. 70).  So, who created the documents?  And when?  And why?  And how did those individuals get the information to create the documents?  These are questions that the IRS should have addressed before the Court admitted the documents.

Similarly, the Court accepted another certification from a company's CFO who was not at the company during the relevant time, yet purported to certify that documents were contemporaneously made by someone with knowledge.  (Doc.12-14 p. 853).  The IRS made no effort to show how the declarant could have knowledge of the underlying documents or the circumstances of their creation.

On another occasion, the Court admitted a hearsay draft contract—which had been neither authenticated nor signed by any purported party—to suggest that the Reynoldses offered to sell the Property. (Doc.15-5 pp. 534-37).

The bulk admission of these documents led to multiple errors in the Court's decision.  For example, the Court tried to conflate all the various entities involved by stating that Bridge Capital is "an entity owned by Messrs. Freeman and Novak" of Strategic.  (Doc.15-14 p. 806).  But there is no evidence in the record to support that assertion.  The only evidence was to the contrary.  (Doc.16-4 pp. 249-50).  Similarly, the Court stated that Reynolds Partners, LP reported its share of parcel sales as ordinary income.  (Doc.15-14 p. 832).  But again, nothing in the record supports this statement.

The Court's bulk admission of evidence is reversible error. *Michener,* 152 F.2d at 885.

## II.     The Tax Court Misinterpreted the Internal Revenue Code.

The Internal Revenue Code allows a charitable deduction for a "qualified conservation contribution."     26 U.S.C. § 170(f)(3)(B)(ii).   The Court erred in interpreting three provisions of Section 170.

### A.     The Court misconstrued the requirement of a qualified appraiser.

To qualify for a charitable contribution deduction under Section 170, a tax return must include a qualified appraisal prepared by a qualified appraiser. *Id.* § 170(f)(11).  The Code and the regulations have detailed requirements for each.  The parties stipulated to those requirements here.  (Doc.12-14 pp. 1072-78).

Nevertheless, the Court relied on an exception in a Treasury Regulation to hold that the appraisers were not qualified.   Treasury Regulation § 1.170A-13(c)(5)(ii) states that an individual is not a qualified appraiser "if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property."  This exception requires a showing of "collusion and deception." *See Kaufman v.* Comm'r, T.C. Memo, 2014-52, *aff'd,* 784 F. 3d 56 (1st Cir. 2016).  The Court erred in applying the exception here because the IRS did not meet its burden of showing the elements.  Instead, the

24

donor reasonably believed that the value of the Property was correct, and there was no agreement between the donor and the appraisers.

First, the Court failed to focus on the *donor's* knowledge. Under the regulation, the question is whether the "donor" (meaning the one with authority over the organization) "had knowledge of facts" about the appraiser. *See Mill Rd. 36 Henry, LLC v. Comm'r*, T.C. Memo. 2023-129, *appeal docketed*, No. 24-11334 (11th Cir. Apr. 30, 2024). Here, the individuals with authority to manage Oconee (the Reynoldses) had *no* contact with the appraisers. (Doc.8-26 pp. 401, 403; Doc.12-5 p. 829). The Court inexplicably inferred that Ciavola (whom the IRS did not call to testify) and Strategic colluded with the appraisers. But even if that were true (which it is not), they were not the "donor."

Indeed, the Court's reliance on third parties was at odds with its own ruling that only the managing member of Oconee has power to act on behalf of the partnership, and the managing member is "managed by the Reynoldses." (Doc.8-20 p. 264). In ruling that the IRS could directly contact Oconee's members during discovery, the Court specifically held that other individuals were not the managers of Oconee and did not have authority to bind the partnership. (Doc.8-20 p. 264). The Court's construction of agency principles cannot be applied differently for purposes of ethics rules and the qualified appraiser regulation. Based on its own

ruling, the Court erred in assuming that an alleged secret agreement made by third parties could be attributed to the donor.

Second, a reasonable person would not have expected the appraisers to *falsely* overstate the value because there was independent, corroborating evidence of the reported value. The Reynoldses' objective knowledge included a market analysis and feasibility study, the success of other developments nearby, actual sales of land from portions of the Parent Tract (for up to $67,136 per acre in 2014), and the 2007 Del Webb sale of approximately 400 acres for $20.3 million. (Doc.8-26 pp. 386, 389; Doc.12-3 pp. 11-59; Doc.12-4 p. 1; Doc.12-5 pp. 1-6, 101, 109; Doc.15-7 p. 40; Doc.15-8 p. 381). The appraisal itself included recent land sales that confirmed the appraised value. (Doc.15-11 pp. 94-95). And if that were not enough, the appraisal was reviewed by a second, independent appraiser—who confirmed that the original appraisers' value was correctly derived and supported "without collaboration or direction." (Doc.15-13 pp. 361-73). There is no evidence to suggest that the reviewer was aware of any purported agreement as to value. And based on his experience, Mercer Reynolds believed it was "a very good appraisal." (Doc.16-3 p. 154). The Court ignored all this independent evidence and instead held that Oconee (i.e., the Reynoldses) must have expected the appraisers to falsely value the Property. But at the very least, that objective evidence confirms what a "reasonable person" would have known.

Notably, the "reasonable person" is one who is unfamiliar with appraisals. *Jackson Crossroads, LLC v. Comm'r*, T.C. Memo. 2024-111. The 326-page appraisal contains the appraisers' independent research efforts and the support for their valuation conclusion. Neither the IRS nor the Court identified any flaw in the appraisal data. Thus, there was simply no basis to assert that a reasonable person would have expected a false valuation. Indeed, the appraisers' qualifications speak for themselves. (Doc.12-14 pp. 1072-78). The Reynoldses had every reason to believe that highly qualified appraisers would accurately value the donation.

Third, there was no evidence of "collusion and deception" here. Discussing value with an appraiser is not surprising—it is nothing more than "relatively normal back-and-forth between client and appraiser." *See Jackson Crossroads*, T.C. Memo. 2024-111, at \*26. Nor did the Court have an evidentiary basis to find collusion. To the contrary, the appraiser's and third parties' unrebutted testimony was that they did *not* have a secret agreement on value, let alone an intent to deceive anyone. (Doc.16-4 p. 215; Doc.15-9 pp. 87, 149); *see Seabrook Prop., LLC v. Comm'r*, T.C. Memo. 2025-6 (explaining that the text focuses on "a taxpayer's knowledge of an appraiser's deception"). The hearsay emails on which the Court apparently relied reflected a *range* of possible values—confirming that there was significant uncertainty. (*See, e.g.*, Doc.13-1 p. 582). Those involved in the donation recognized that they could not move forward until the appraisers determined a value. (Doc.12-

27

9 pp. 19-20; Doc.16-4 p. 220).  And if Ciavola had a secret agreement to value the Parent Tract at $60 million, then why did the appraisers value it at $50 million? (Doc.15-9 p. 82; Doc.15-12 pp. 31, 516).

Fourth, the Court improperly applied the exception based on the Court's own retroactive disagreement with the appraised value.    Rather than ask whether there was a false valuation, the Court apparently assumed falsity based on its own determination of value.  That approach is contrary to existing law because an *incorrect* appraisal can still be a "qualified" one.  *See, e.g.*, *Friedberg v. Comm'r*, T.C. Memo. 2013-224 (citing *Scheidelman v. Comm'r.*, 682 F.3d 189, 196-198 (2d Cir. 2012)) (reiterating that reporting requirements are fulfilled when the appraiser "makes the requisite declaration" and "if the appraiser's analysis is present, even if the Commissioner deems it to be unconvincing").

Here, the appraisal accomplished "the purpose of the reporting regulation." *Scheidelman*, 682 F.3d at 198.  Because the IRS did not prove that the donor-knowledge exception applies, and the parties stipulated to all the affirmative requirements, the Court erred in holding that the donation was not supported by the opinion of qualified appraisers.

28

**B.    The Court erred in interpreting the reasonable cause defense.**

Oconee had reasonable cause to believe that it could take the deduction that Congress authorized.[5]

Notwithstanding a lack of literal or substantial compliance with the Code or the regulations, a taxpayer can be excused from a regulatory requirement due to reasonable cause.  *See* 26 U.S.C. § 170(f)(11)(A)(ii)(II); *Crimi v. Comm'r*, T.C. Memo. 2013-51; *see also Corning Place Ohio, LLC v. Comm'r*, T.C. Memo. 2022-12.  A taxpayer acts with reasonable cause when it exercises ordinary business care and prudence. *United States v. Boyle*, 469 U.S. 241, 245 (1985).

Reasonable cause can include relying on the advice of a professional.  *See Neonatology Assocs., P.A. v. Comm'r*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).  A taxpayer can rely upon the advice of a tax adviser, lawyer, or accountant.  *Gustashaw v. Comm'r*, 696 F.3d 1124, 1139 (11th Cir. 2012) (citing *Boyle*, 469 U.S. at 251).  When an accountant or attorney advises a taxpayer on a matter of tax law, it is reasonable for the taxpayer to rely on that advice.  *Boyle*, 469 U.S. at 251.  There is no requirement to challenge the adviser or obtain a "second opinion."  *Boree v. Comm'r*, 837 F.3d 1093, 1106 (11th Cir. 2016) (citing *Boyle*, 469 U.S. at 251).  The question is not whether the professional was *correct* but rather

---

[5] Curiously, the Court stated that the deduction was provided "by the U.S. Treasury." (Doc. 15-14 p. 818).  This statement highlights the Court's disregard for the legislature's policy decisions.

whether the taxpayer reasonably relied on the professional's judgment. *Woodsum v. Comm'r*, 136 T.C. 585, 593 (2011).

Here, in addition to the appraisers themselves, Oconee relied on an accountant and the ongoing tax advice and opinion of a law firm. (Doc.16-3 p. 155; Doc.16-4 pp. 127-31, 374-75; Doc.12-9 pp. 182-235). Even if there were some defect in the appraisal (which Oconee denies), there was reasonable cause. Any noncompliance should be excused because Oconee reasonably and in good faith relied on the advice it received.

The Court conflated the reasonable cause defense under *Boyle* with the donor-knowledge exception discussed above. According to the Court, because it determined the appraisers were not qualified based on their valuation, Oconee could not have reasonably relied on anyone. But Congress contemplated that there would be circumstances in which a taxpayer failed to comply with some regulatory requirement and yet could be excused. Oconee presented such a circumstance here.

### C.    The Court misconstrued the term "inventory."

As another basis to vitiate the deduction, the Court held that the easement should be treated as "inventory" of the Reynoldses (and therefore Carey Station and therefore Oconee), subject to the limitations on charitable deductions imposed by Section 170(e). This holding was erroneous for several reasons.

### 1.    Separate corporate entities are treated separately.

The Court concluded that the easement must have been inventory because "Jamie Reynolds and Reynolds Partners were engaged in the real estate development business." (Doc.15-14 pp. 833-34). But that conclusion is inconsistent with the record. It was Linger Longer—an entirely separate entity—that engaged in real estate development. (Doc.8-26 pp. 382-83, 395).

The Court was obligated to recognize this distinction. The Supreme Court has held that "so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity." *Moline Props. v. Comm'r*, 319 U.S. 436, 439 (1943). This recognition makes sense, because "[t]he doctrine of corporate entity fills a useful purpose in business life." *Id.* at 438. The law of the land is that a corporate entity has "a tax identity distinct from its stockholder." *Id.* at 440; *see also Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1208 (5th Cir. 1980) ("[I]f the separateness of the corporation and its shareholders is a fiction, it is one which the law has long recognized and will not lightly go behind.").[6]

The Court erred in disregarding legal entities here. It acknowledged that the Reynoldses "created dozens of distinct entities," (Doc.15-14 p. 786), but in its

---

[6] Decisions of the Fifth Circuit prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 160 n.4 (1988) (citing *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)).

analysis it simply collapsed the entities into one. Directly contrary to the teachings of *Moline Properties*, the Court deemed it "immaterial" which entity did what. (Doc.15-14 p. 834). But Reynolds Partners was established as an *investment* entity (not a developer) in 1987. (Doc.8-19 pp. 11, 54-96; Doc.16-3 pp. 163-64, 251-52). Reynolds Partners and Jamie Reynolds purchased the Parent Tract in 2003 and held the land as an investment. (Doc.8-19 pp. 12-13, 103-10). If they wanted to develop the property, they would have sold to Linger Longer—just as they did with other property that the Reynoldses wanted to develop. (Doc.16-3 pp. 136-37, 264-73). The Court could not simply ignore the separate existence of Linger Longer as the development entity. When someone is both a developer and an investor, and has separate entities for both types of business, it cannot be that every property is inventory to be developed. *See, e.g.*, *Brannen v. Comm'r*, 722 F.2d 695, 703 (11th Cir. 1984) ("[T]he business of a partnership is a separate business from that of the partners . . . .").

### 2. Inventory means property held for sale in the ordinary course of business.

As relevant here, inventory is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C. § 1221(a)(1). The Property was not inventory because it was not held for sale in the ordinary course of the business of Reynolds Partners or Jamie Reynolds. Indeed, the tract

was not sold at all.  Instead, Oconee granted an easement over the Property.  Nor was the Parent Tract held for sale in the ordinary course of business.

Notably, not all property is procured for sale; some property is held for investment.  The so-called "*Winthrop* factors" are used to distinguish between the two: 1) the nature, purpose, and duration of ownership of the property; 2) efforts to sell the property; 3) number and substantiality of other sales; 4) extent of developing and advertising the property for sale; 5) use of a business office to sell the property; 6) supervision and control over a representative trying to sell the property; 7) time and effort the owner devotes to sales, and 8) prior treatment by the taxpayer.  *United States v. Winthrop*, 417 F.2d 905, 909-10 (5th Cir. 1969); *Boree*, 837 F.3d at 1100.  In essence, the more that the record shows the things that are typically associated with a sale, the more likely a court is to deem the property inventory.

Here, the factors are all contrary to the Court's conclusion.  First, the Property was acquired in 2003 as investment property.  (Doc.8-19 p. 12; Doc.16-3 pp. 163-64, 251).  Although the Property changed owners over time, none of the owners had a different purpose for the Property.  Second, the owners took no affirmative steps to sell the Property.  (Doc.16-3 pp. 148-50).  Third, although Reynolds Partners and then Carey Station sold or transferred portions of the Parent Tract over the course of 12 years, the 11 conveyances (averaging less than 16 acres) constituted only 15% of the total acreage.  (Doc.8-19 pp. 14-18, 19).  And most of those conveyances

occurred during the receivership. (Doc.12-5 pp. 273-667; Doc.8-26 p. 395). Fourth, although future development was considered as an option, the owners did not advertise the Property for sale or engage in any affirmative development activity such as streets or utilities; the land remained undeveloped at the time Oconee became the owner. (Doc.8-26 p. 385). Fifth, the owners did not use a business office to try and sell the Property. (Doc.16-3 p. 251). Sixth, they did not engage a representative to sell the Property. (Doc.16-3 p. 235). Engaging a third party to assist in liquidating an asset does not convert it from investment property to inventory. *See Smith v. Dunn*, 224 F.2d 353 (5th Cir. 1955) (holding that liquidation and subdivision by a broker did not change brothers' investment intent); *see also Haynsworth v. United States,* 47 A.F.T.R.2d 81 (Ct. Cl. 1981) (holding character of property changed from inventory to investment upon partnership liquidation). Seventh, the owners did not devote time and effort to selling or developing the Property. (Doc.16-3 p. 235). Only Linger Longer was pursuing that option. Eighth, Oconee treated the Property as long-term capital gain property on its tax return.[7] (Doc.15-14 p. 810).

---

[7] Instead of citing to Oconee's tax return, the Court cited to *other* tax returns that reported *other* sales as generating ordinary income. (Doc. 15-14 p. 832). Even if those returns had some relevance, the Court ignored their content and agreed facts. (Doc. 8-26 p. 389). For example, Carey Station treated the Property as a capital asset on its tax return. That company originally reported $0 in inventory at the beginning and end of the tax year and reported gain from a sale of an asset "*other than inventory*." (Doc. 15-11 pp. 336, 340, 345). Before the Oconee return was filed, Carey Station amended (and the IRS accepted) its return to list the sale as long-term

While Ted Baker (a real estate broker and business partner of Jamie Reynolds) put a sign on the *Parent Tract* (rather than the Property) to garner interest for Jamie Reynolds, (Doc.16-4 p. 563), Baker never set a traditional asking price because this was not a traditional listing. (Doc.16-4 p. 564). He did not speak with co-owner Mercer Reynolds—who was looking for a joint venture partner. (Doc.16-4 p. 567). Baker confirmed that the Property was never listed on the open market. (Doc.16-4 p. 566). Contrary to the IRS' theory (and the Court's supposition), Baker also confirmed he never had authorization to sell the Property for $7.7 million. (Doc.16-4 pp. 559-66). Reynolds Partners and Jamie Reynolds owned the Property jointly; Baker could not sell anything or agree to anything without the consent of all owners.

The Property was treated as an investment, not as inventory for sale. That *other* portions of the Parent Tract were conveyed confirms that this Property was different. *See Fahs v. Crawford*, 161 F.2d 315, 317 (5th Cir. 1947) ("Merely disposing of investment assets at intermittent intervals, without more, is not engaging in business, even though some preliminary effort is necessary to render the asset saleable.").

The Court erred in treating the Property as inventory and thereby reducing the amount of the charitable deduction.

---

capital gain—and still not inventory. (Doc. 8-26 p. 389; Doc. 12-5 pp. 116, 130, 136).

### 3.     The inventory rules do not apply to the donation of a partial interest in real estate.

The Court also erred in assuming that the inventory rules apply here at all.  A restriction on the use of property is not inventory, so Sections 170(e)(1) and 724(b) do not apply.  Oconee donated a qualified real property interest consisting of a perpetual restriction on the use that can be made of the Property.  The gift was a restriction, not a fee simple interest.  Unlike the sale of inventory, charitable contributions of restrictions on property do not result in the recognition of gain or loss.  *Campbell v. Prothro*, 209 F.2d 331 (5th Cir. 1954); 26 U.S.C. § 724(d)(3)(A) (providing that a nonrecognition transaction maintains the same tax character).

A restriction on real property is not inventory, as confirmed by the plain language of the Internal Revenue Code, legislative history, and other sources.  *See, e.g.*, *Long v. Comm'r*, 772 F.3d 670 (11th Cir. 2014) (holding that sale of a portion of a judgment giving the right to purchase land should be taxed as capital gain).

Section 170(e) does not reference qualified conservation contributions described in Section 170(h).  If Congress had intended to limit the Section 170(h) deduction by Section 170(e)'s inventory rules, it could have done so by including "qualified conservation contributions" in addition to contributions of "property."  Further, when Section 170 was modified in 1980 to allow a deduction for certain contributions of partial interests in property, Congress never contemplated that the inventory rules would apply.  *See, e.g.*, Senate Finance Committee, Tax Treatment

Extension Act of 1980, S. Rep. No. 96-1007, at 9 (June 12, 1980). Standard rules of statutory construction require the omission of any reference to "qualified conservation contributions" from Section 170(e) be treated as intentional and significant. *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993); *Russello v. United States*, 464 U.S. 16, 23 (1983).

Treasury Regulations specify how partial interests in real estate are valued. *See* Treas. Reg. § 1.170A-14. Nothing in those regulations envisions a partial conservation interest as inventory subject to the reduction rules of Section 170(e)(1). If Section 170(e)'s inventory rules were intended to apply to qualified conservation contributions, the regulation defining valuation of such contributions would have indicated so.

The purpose of Section 170(h) was to encourage donations of qualified real property interests to limit development and support conservation efforts. S. Rep. No. 96-1007, at 9 (June 12, 1980). Landowners have contributed to that conservation effort for decades, and the IRS did not challenge the value of those donations as inventory items.

The Court did not address any of these arguments. It simply said that an easement must be inventory because a car dealership donating an engine from a car has disposed of inventory. (Doc.15-14 p. 835). But that makes no sense. Under that analogy, Oconee did not donate an "engine" and was not in the business of

selling engines in any event. Instead, if the analogy were apt, Oconee forever restricted others from driving a car on the lot, even cars with an engine. Such a restriction is not inventory according to any common-sense interpretation of the word.

### 4.    Oconee substantiated its basis.

Even if the Court were correct that the easement was inventory, it would not eliminate the deduction. It would only mean that the deduction is limited to Oconee's basis in the Property.

The Court held that Oconee supplied "no evidence" of its basis, (Doc.15-14 p. 810), but that is simply wrong. The parties submitted four *joint* exhibits reflecting Oconee's basis and its calculation. (Doc.15-11 pp. 332-69; Doc.12-5 pp. 111-48).

Further, the Court's ruling is internally inconsistent. The Court relied on the statements on the original tax returns to hold that the Property should be treated as inventory but then four pages later said that statements on a tax return were not evidence of basis. (*Compare* Doc.15-14 p. 832, *with* Doc.15-14 p. 836). Both of those cannot be true.

## III.    The Court Erred in Valuing the Charitable Deduction.

As this Court has explained, the value of a conservation easement donation is the FMV "of the perpetual conservation restriction at the time of the contribution.'" *Pine Mountain Pres., LLLP v. Comm'r*, 978 F.3d 1200, 1210 (11th Cir. 2020)

(quoting Treas. Reg. § 1.170A-14(h)(3)(i)).  The value is the difference between the FMV before the donation and the FMV after.  *Id.* at 1210-11.

Valuation must consider the property's highest-and-best use both before and after the contribution.  This analysis includes "an objective assessment of how immediate or remote the likelihood is that the property, absent the restriction, would in fact be developed."  Treas. Reg. § 1.170A-14(h)(3)(ii).

### A.    The Court erred in disregarding relevant evidence establishing fair market value.

The record contains extensive evidence establishing the FMV of the Property before the donation.  Yet, the Court concluded that conserving 355 acres of property near Lake Oconee was worth little.  The only way the Court could reach that conclusion was by ignoring evidence in the record (including two expert appraisers who live in the area).

Multiple appraisers agreed that near-term, mixed-use development for middle-income buyers was the highest-and-best use as of December 31, 2015.  (Doc.15-11 pp. 87-88; Doc.15-8 pp. 112, 429-30).  If that were not enough, the record contained corroborating evidence of ongoing development from (i) the Greene County Commissioner (Doc.8-19 pp. 16, 201-28; Doc.12-5 p. 101); (ii) the Green County Development Authority (which had already issued a bond to build a charter school in the area) (Doc.8-19 pp. 16, 198-99; Doc.16-3 p. 274); (iii) the hospital authority that built a hospital in the area (Doc.8-19 pp. 16, 19); (iv) national

developers like Pulte (who purchased from them to develop the Del Webb) and urban planners (Doc.16-3 p. 553; Doc.15-9 p. 172; Doc.12-1 pp. 4-119; Doc.12-2 pp. 1-59; Doc.12-3 pp. 1-7); (v) real estate consultants (Doc.12-3 pp. 11-59; Doc.12-4 p. 1; Doc.12-5 pp. 1-6; Doc.16-1 p. 87); (vi) a retired developer (who noted that developers and retailers would not be in the area without doing their due diligence) (Doc.15-9 p. 172); and (vii) and USPAP expert Ted Whitmer, who wondered where everyone lived when he visited the area (Doc.16-4 p. 487).

The Court did not make any explicit credibility determinations about any of this evidence; it simply ignored the evidence altogether. That was improper. *See, e.g.*, *Bazemore v. Friday*, 478 U.S. 385, 387 (1986); *Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1341, 1359 (11th Cir. 1994); *Jean v. Nelson*, 711 F.2d 1455, 1493-94 (11th Cir. 1983). Turning a blind eye to relevant information renders a decision arbitrary and capricious. *Cf. Mickell v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 593 (11th Cir. 2020); *Adu v. U.S. Att'y Gen.*, 785 F. App'x 776, 784 (11th Cir. 2019) (per curiam); *Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1260-61 (11th Cir. 2007); *see also Bexar Plumbing Co. v. NLRB*, 536 F.2d 634, 636 (5th Cir. 1976) ("[T]he Board was much too restrictive in its view of the evidence, overlooking or ignoring evidence of strong probative value which was inconsistent with its view of the case."); *Boysen v. Ill. Tool Works Inc. Separation Pay Plan*, 767 F. App'x 799, 809 (11th Cir. 2019) (per curiam)

(reiterating that regardless of who has the burden of proof, a factfinder is not "free to simply ignore evidence that has a direct bearing on, or refutes, his findings"). In addition to the legal error, the Court's results-oriented approach leads to "a definite and firm conviction that a mistake has been committed after reviewing the evidence as a whole." *FTC v. AbbVie Prods. LLC,* 713 F.3d 54, 69 (11th Cir. 2013) (internal quotation omitted).

The Court was not required to *agree* with this evidence. What it could not do was ignore the evidence altogether.

### B. The Court misapplied the highest-and-best use analysis.

Highest-and-best use analysis has long been a part of the law addressing valuations of interests in real property. The Supreme Court has explained that a valuation "may reflect the use to which the land could readily be converted, as well as the existing use." *United States v. Causby*, 328 U.S. 256, 261 (1946); *see also Olson v. United States*, 292 U.S. 246, 255 (1934); *Miss. & Rum River Boom Co. v. Patterson*, 98 U.S. 403, 408 (1878). Congress specifically adopted this approach to value conservation easement donations. S. Rep. No. 96-1007, at 15 (1980); *see also* Treas. Reg. § 1.170A-14(h)(3)(ii) (adopting similar language).

Thus, valuation must be tied to the land's highest-and-best use. *See, e.g.*, *Palmer Ranch,* 812 F.3d at 987. Specifically, the "before value must consider the parcel's highest and best 'reasonable and probable use that supports the highest

present value.'" *Id.* (quoting *Symington v. Comm'r,* 87 T.C. 892, 897 (1986)). "The '*focus [is] on the highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future.'" *Id.* (quoting *Symington*, 87 T.C. at 897); *see also Glade Creek Partner, LLC v. Comm'r,* No. 21-11251, 2022 WL 3582113, at *5 (11th Cir. Aug. 22, 2022) (per curiam) ("To calculate the before value of the property, courts must first determine the property's highest and best use.").

Here, everyone except the IRS appraiser agreed that the pre-donation highest-and-best use of the Property was mixed-use development. The Property is located between Atlanta and Augusta, and lots in the nearby gated communities sell from $200,000 for a wooded lot to $5 million for a lakefront lot. (Doc.16-3 p. 609; Doc.15-9 p. 24).

Notably, growth in this area continued even after the recession of 2008. (Doc.16-3 pp. 385, 392; Doc.15-8 p. 122; Doc.16-3 p. 140). Del Webb and other gated communities continued to sell lots throughout the recession. (Doc.16-3 pp. 385-89, 392). The Greene County Development Authority issued a bond to purchase land to build the charter school Lake Oconee Academy. (Doc.8-19 pp. 16, 198-99; Doc.16-3 p. 274). The County Manager confirmed that post-recession growth continued when St. Mary's Health Care System purchased land to build a hospital on a portion of the Parent Tract. (Doc.8-19 pp. 16, 201-28; Doc.12-5 p. 101). Then

in May 2014, Carey Station Communities bought 15.43 acres to build a starter home community near the charter school.  (Doc.8-19 pp. 17, 238-40; Doc.16-3 pp. 203-04, 719).

However, the existing communities did not account for all needs.  There was a significant market gap for mid-priced residential development as well as additional commercial development.  The market was missing housing for ordinary people who worked in the area but could not afford to pay the expense of living in the gated communities.  (Doc.16-3 pp. 147-49, 509, 549-50, 685; Doc.16-4 p. 488).  There was also a need for senior housing, (Doc.16-3 pp. 551-52, 661-66), additional hotel space, (Doc.16-3 pp. 674-75), and a competing grocery store, (Doc.16-3 p. 684; Doc.15-8 pp. 97-99).  Mixed-use development would have been the highest-and-best use of the Property.

Greene County confirmed as much.  It had zoned the Property CPUD (i.e., mixed-use development consisting of commercial and residential).  Greene County believed this development was suitable for the area and would benefit the County as a whole.  (Doc.8-19 p. 20; Doc.16-3 p. 265).  This belief was reinforced by the 2006 RCLCo study.  (Doc.8-26 p. 385; Doc.16-3 pp. 139-40, 267, 272; Doc.12-3 pp. 11-59; Doc.12-4 p. 1; Doc.12-5 pp. 1-6).  That study determined that mixed-use development was possible, and absorption would occur over 10 years.  (Doc.16-3 p. 273; Doc.12-3 pp. 11-59; Doc.12-4 p. 1; Doc.12-5 pp. 1-6).  The $20.3 million sale

of 407 CPUD acres for Del Webb showed there was demand for housing alternatives as early as 2007.

Indeed, demand in that starter home community was consistent since building began. (Doc.16-3 p. 389). Demand was also consistent in other communities in the Lake Oconee area including Harbor Club and Del Webb, as well as the Met Life-owned Lake Oconee communities. (Doc.16-3 pp. 385, 387, 389, 392).

There was sufficient evidence that the highest-and-best use was mixed-use development, which should have been the basis for the Court's valuation of the Property. One way to determine FMV is to "look to actual, comparable sales on the open market between other willing buyers and sellers." *S. Grande View Dev. Co. v. City of Alabaster*, 1 F.4th 1299, 1314 (11th Cir. 2021); *see also Transwestern Pipeline Co. v. O'Brien*, 418 F.2d 15, 17 (5th Cir. 1969) ("The comparative sales approach enables the court to reason by comparison as to how much a prospective purchaser would pay and an owner accept for the property . . . ."). Indeed, without previous sales of the property at issue, truly comparable sales can "constitute the best evidence of market value." *United States v. Easements & Rights-of-Way Over a Total of 15.66 Acres of Land*, 779 F. App'x 578, 581 (11th Cir. 2019) (per curiam); *see also United States v. 320.0 Acres of Land*, 605 F.2d 762, 798 (5th Cir. 1979).

The more comparable a sale is, the more probative it will be of FMV. *S. Grande View*, 1 F.4th at 1314. That means the comparable property should have the

44

same or similar zoning, be in a similar type of location, and have similar access to amenities. While comparable sales in the same county are preferable for a run-of-the-mill parcel, comparable sales for complex development parcels (like the Property here) may require looking elsewhere.

Oconee presented such comparable sales here. The original appraisers determined the before value of the Property to be $21,200,000, the after value to be $530,000, and the resulting easement value to be $20,670,000. (Doc.8-19 p. 333). To determine the before value, the appraisers used five comparable sales located in resort type areas, most of which had been purchased in 2014 or 2015 by regional or national developers and homebuilders. The comparable sales had indicated values ranging from $57,619 to $68,694 per acre. (Doc.15-11 pp. 94-115). Those sales supported the original appraisers' before value of $59,964 per acre.

Local appraiser George Galphin determined that the before value was $19,530,000, and the after value was $850,000, for an easement value of $18,680,000. (Doc.15-8 pp. 31-305). This appraiser selected other metro Atlanta properties as comparable sales. These sales had indicated values ranging from $44,000 to $78,769 per acre. (Doc.15-8 pp. 117-19). This data supported Galphin's opinion that the before value of the Property was $55,014 per acre.

Chris Clanton, another local appraiser, selected as his comparable sales four sales located near water or golfing communities. (Doc.15-8 p. 433). To reach a

conservative valuation opinion, none of the comparable sales were in luxurious locales or affiliated with a 5-star luxury resort.  Still, the comparable sales had indicated values of $44,929 to $55,000 per acre.  (Doc.15-8 pp. 433-51).  Even taking the most conservative approach, this data supported a before valuation of $47,042 per acre.

Each of these appraisers was able to locate several arms-length sales involving purchases in comparable locales and with a mix of residential and commercial uses. The evidence was overwhelming that the highest-and-best use of the Property was mixed-use development and that the Property was valuable.  Other than the IRS appraiser, *all* the witnesses confirmed as much.  Even disinterested parties (including Greene County and the hospital authority) agreed.

But the Court ignored all of this evidence.

## C.    The Court erred in striking an expert report.

All the valuations were also corroborated by Belinda Sward's feasibility study.  Sward previously worked for RCLCo and was familiar with the Parent Tract. (Doc.16-3 p. 415).

But while admitting hundreds of hearsay documents, the Court *excluded* significant portions of Sward's expert report because she relied on information and data after the date of the donation.  (Doc.15-14 p. 812).  Initially, the Court indicated

that it would accept the report with certain portions stricken.[8] (Doc.16-3 p. 9). But in its opinion, the Court refused to consider the report at all, stating (without explanation) that it was "unreliable." (Doc.15-14 p. 845).

This holding was erroneous for two reasons. First, subsequent events may be considered in valuing property to the extent those events shed light upon facts and circumstances that existed on the valuation date. *Gross v. Comm'r*, T.C. Memo 1999-254, *aff'd*, 272 F.3d 333 (6th Cir. 2001); *Trout Ranch LLC v. Comm'r*, T.C. Memo. 2010-283, *aff'd*, 493 F. App'x 944 (10th Cir. 2012). Accepted appraisal standards confirm as much. (Doc.15-8 p. 1027).

Indeed, even the IRS appraiser used post-2015 data. (Doc.15-7 pp. 26, 31, 42-43, 57-58, 102-09, 117, 178). "In the law, what's sauce for the goose is normally sauce for the gander," and courts apply "this commonsense principle of equal treatment in the context of expert witnesses." *United States v. Knowles*, 889 F.3d 1251, 1257–58 (11th Cir. 2018). The Court erroneously faulted Oconee's expert for doing the same thing that the IRS expert did.

Second, even if a portion of the report had been improper, that was not a basis to disregard the report entirely. Expert opinions are often deemed admissible in part and inadmissible in part. *See, e.g.*, *Johnson v. Thibodaux City*, 887 F.3d 726, 736

---

[8] Sward confirmed that even without evidence of subsequent data, the opinions contained in her expert report would not change. (Doc. 16-3 p. 509).

(5th Cir. 2018); *United States v. 87.98 Acres of Land*, 530 F.3d 899, 906-07 (9th Cir. 2008).

Further, this error was prejudicial. The Court could only reach a low valuation for the donation by ignoring Sward's report (as it did with all other evidence that did not support its conclusion). For example, the costs associated with living in the luxury gated communities are far beyond the means of middle-income individuals because (among other things) they require high annual fees.[9] (Doc.16-1 p. 68). By simply ignoring the evidence, the Court did not address this or other facts that contradicted its analysis.

The appropriate record (including the entirety of Sward's report) shows the flaw with the Court's valuation analysis.

### D.    The Court erred by using a comparable-sales analysis without comparable sales.

Rather than grapple with all the evidence showing the Property's true FMV, the Court adopted the analysis of the only valuation witness the IRS offered.

The IRS appraiser formed his opinion based solely on MLS listings, a blog post, and conversations with individuals from outside the area. (Doc.15-7 pp. 35-

---

[9] While excluding evidence of thousands in annual fees and other costs associated with these luxury communities, the Court said there was no need for housing alternatives because the IRS appraiser's MLS list included one unidentified sale for $200,000. (Doc. 15-14 p. 843). That was not a sufficient basis to disregard the remainder of the record.

38).  In those conversations, he did not inform the interviewees of the Property he was appraising. (Doc.16-3 p. 259).  A reader of the IRS appraiser's report might believe that these independent individuals agreed with him on the highest-and-best use for this Property.  Not so.  One of the individuals, a real estate professional from Atlanta, testified that had he been aware that the IRS appraiser was referencing the Property, his response would have been different.  (Doc.16-3 pp. 260-61).  Unlike the IRS appraiser, this individual *is* familiar with the Property.

The IRS appraiser failed to see the obvious because he failed to prepare any feasibility study for the Property, review the RCLCo feasibility study or Urban Design report before doing his report, or even speak to Greene County management about housing needs in the area.  (Doc.15-7 pp. 178-80).  Instead, the IRS appraiser insisted that because the existing market consisted of high-end amenity-laden golf and lakefront gated communities, then the Property would be the last parcel to be developed.  (Doc.15-7 pp. 37-38, 47, 65, 67-68).  In other words, without space for a golf course or acreage bordering on a lake, no one would want to live there.  But the flaw in this approach is that a luxury gated community was not in competition with this Property.  The expense of buying and maintaining lots in the gated communities created a gap in the market that needed to be filled.  Linger Longer realized this, as did RCLCo, Sward, Van Sant, Wingard, Galphin, Clanton, and Whitmer, and the entire Greene County Development Authority.

Further, to find sales that supported his conclusion of long-term holding, the IRS appraiser bypassed more-recent sales of his chosen properties and relied instead on earlier bank sales to speculators and a sale made under duress. (Doc.15-8 pp. 1030-33). He also relied on forced sales, distressed sales, and fire sales, even though those transactions are the antithesis of FMV sales—and an analysis that uses such sales to determine FMV should be ignored. *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 539 (1994); Rev. Proc. 74-29. Distressed sales simply do not reflect FMV, because the concept "presumes market conditions that, by definition, simply do not obtain in the context of a forced sale." *BFP*, 511 U.S. at 539; *see also DAGS II, LLC v. Huntington Nat'l Bank*, 865 F.3d 384, 388 (6th Cir. 2017); *Redus Fla. Com., LLC v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1195 n.15 (11th Cir. 2014); *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1370-71 (Fed. Cir. 2010); *United States v. 79.75 Acres of Land*, 459 F.2d 185, 187 (10th Cir. 1972). That is, a factfinder cannot rely on sales "as indicating true market value when in fact they do not." *Transwestern Pipeline*, 418 F.2d at 18. As this Court noted, "where a sale is not made at arm's length, it provides scant evidence of comparable value." *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988).

The Court made no effort to explain how the IRS appraiser's distressed sales were an appropriate basis to determine the FMV of the Property here. Its "[u]se of only distressed sales unduly lowers the value" of this Property. *In re Williams*, 480

50

B.R. 813, 816 (E.D. Tenn. 2012): *see also BFP,* 511 U.S. at 538 (discussing the "glaring discrepancy between the factors relevant to an appraisal of a property's market value, on the one hand, and the strictures of the foreclosure process on the other" and noting that "no one would pay as much to own such property as he would pay to own real estate that could be sold at leisure and pursuant to normal marketing techniques"); *Resolution Tr. Corp. v. Carr,* 13 F.3d 425, 430 (1st Cir. 1993); *Am. Society of Composers, Authors & Publ'rs v. Showtime/The Movie Channel,* 912 F.2d 563, 571 (2d Cir. 1990).

The Court's blind acceptance of distressed sales to value the Property was erroneous.  As one judge explained, "[i]t does not need elaborate discussion [that] a distressed sale certainly does not bring a price which is even near or close to the appraised value of the property."  *In re Steffen,* 342 B.R. 861, 870 n.2 (Bankr. M.D. Fla. 2006); *see also Resol. Tr. Corp. v. Carr,* 13 F.3d 425, 430 (1st Cir. 1993); *Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.,* 912 F.2d 563, 571 (2d Cir. 1990).

Further, most of the IRS appraiser's "comparable" sales occurred years before the donation, at the height of the recession.  (Doc.15-7 pp. 120, 127, 129, 132).  The IRS appraiser also willfully refused to consider more recent data, even on his own "comparable" sales.  One property flipped within a few months (and before the valuation date at issue) to sell for $47,987 per acre—but the IRS appraiser chose to

use the earlier sale to a land speculator at only $10,000 per acre. (Doc.15-8 p. 1030). Similarly, another tract sold in February 2012 for $10,286 per acre. Before the end of 2012, the property was sold again for an average of $33,586 per acre—but the IRS appraiser deliberately chose to ignore those numbers in his analysis. (Doc.15-8 pp. 1032-33).

Additionally, the IRS appraiser's "comparable" sales did not have the same or similar physical, legal, and locational characteristics as the Property. (Doc.15-8 p. 1005). The sales the IRS appraiser selected were far from amenities, unlike the Property. (Doc.16-4 p. 495). Yet, the IRS appraiser made no adjustment for zoning. (Doc.16-4 p. 497). One of the sales was in Douglas County. As one expert observed, comparing property in Douglas County with the Lake Oconee area is like comparing apples and "not even a fruit." (Doc.16-4 p. 675). Individuals from Georgia would know the areas are completely different, but the Court made no effort to account for the difference. Further, the IRS appraiser's sales were mostly rural properties, whereas the Property is located between multiple high-end subdivisions and near golf and other recreational amenities. When sales require a 46% adjustment, they are no longer "comparable." (*See* Doc.15-7 p. 74). The result was, as Whitmer noted, "[v]irtually all inputs in the appraisal resulted in a low valuation. This includes [the IRS appraiser's] conclusion of ultimate highest and best use to sell to

a warehouser of property, selection of bank sales, selection of sales in inferior areas, lack of adjustments for inferior factors of the comparable" sales. (Doc.15-8 p. 1008).

The Court also erred in valuing the Property based solely on the Reynoldses' previous ownership during the receivership. In valuing property "under the before-and-after method, the land should be assumed to be in the hands of hypothetical persons," not the actual landowner. *Pine Mountain Pres., LLLP v. Comm'r*, T.C. Memo. 2018-214; *see also Whitehouse Hotel*, 615 F.3d at 335. That makes sense because FMV is the value at which property would change hands between a willing buyer and a willing seller. Treas. Reg. § 1.170A-1(c)(2). And those are *hypothetical* individuals. *Cave Buttes, LLC v. Comm'r*, 147 T.C. 338, 364 n.16 (2016); *see also Davis v. Comm'r*, T.C. Memo. 2015-88; *Bogdanski*, Federal Tax Valuation § 3.02. The hypothetical individuals "are presumed to be dedicated to achieving the maximum economic advantage." *Estate of Newhouse v. Comm'r*, 94 T.C. 193, 218 (1990); *see also Est. of Watts v. Comm'r*, 823 F.2d 483, 486 (11th Cir. 1987). The Court's exclusive reliance on the Reynoldses' business struggles during the receivership was error. Nowhere in the opinion did the Court address what a willing buyer or seller would have done.

Moreover, the Court referenced earlier bank appraisals assessing the liquidation value of the Property—while ignoring that their contents expressed liquidation values. (Doc.15-14 pp. 792-94). If a borrower might be unable to repay

a loan in full, a bank's workout group conducts an analysis to determine the *liquidation* value of any collateral, such as the land. (Doc.16-4 pp. 692-94; Doc.13-5 pp. 339-414). In 2011, a real estate company prepared such a liquidation value appraisal for the PNC loan. (Doc.16-4 pp. 692-94; Doc.13-5 pp. 339-414). In 2014, a similar appraisal was prepared for Farmers Bank. (Doc.16-4 p. 704). The Farmers Bank appraisal explained it was created "for disposition of the asset" (i.e., a liquidation value). (Doc.16-4 pp. 784-85; Ex. 162-R). These appraisals should not have been admitted into evidence at all (as discussed above), but they certainly should not have been used as a basis to determine FMV. Indeed, Robert Gaudet explained that in such situations, the bank is facing possible foreclosure and bank ownership of the asset. Gaudet's entire banking career has been focused on managing foreclosed or criticized banking assets, including land. (Doc.16-4 pp. 626-27). Gaudet provided unrebutted testimony that when the workout group of a bank requests an appraisal of a "criticized" asset, such as property in receivership, it seeks liquidation or quick-sale value. (Doc.16-4 pp. 692-700). And "if intended use is foreclosure, that is the value you will get." (Doc.16-3 p. 170; Doc.16-4 p. 765). Yet the Court's opinion did not address this issue (or reference Gaudet) at all—preferring instead to use a liquidation value as FMV. (*See* Doc.15-14 p. 850).

Indeed, if the Court wanted to rely on the "historical record relating to valuation of the Parent Tract," (*see* Doc.15-14 p. 850), it had an opportunity to do

so: by considering the prior sales of portions of that tract, including the $20.3 million Del Webb sale. Those actual sales went up to $67,136 per acre—more than six times the amount on which the Court relied from the liquidation value appraisals. Why did the Court disregard the historical record of *actual* sales? And how did the Court reach the conclusion that the area had dropped in value by 72% from the Del Webb sale?

In addition, the Court relied on alleged offers to purchase the Parent Tract. (Doc.15-14 pp. 850-51). But "[i]t is well settled that a mere offer, unaccepted, to buy or sell is inadmissible to establish market value." *United States v. Smith*, 355 F.2d 807, 811 (5th Cir. 1966) (collecting cases); *see also Sharp v. United States*, 191 U.S. 341, 348-50 (1903); *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675-76 (7th Cir. 2009). The Court claimed it was using these offers as a "sanity check" of its predetermined conclusion, (Doc.15-14 p. 851 n.31), and yet it also said this "historical record" was what "firmly supported" its conclusion, (Doc.15-14 p. 850). The Court could not rely on "inadmissible" evidence to support its conclusion.

Finally, the Court suggested that its valuation was supported by the total investment of the partners in Oconee. (Doc.15-14 pp. 851-52). However, Will Frazier's unrebutted partnership valuation expert evidence was that the total investment did *not* indicate the value of the Property. (Doc.15-8 pp. 913-63). Once again, the Court's opinion ignored Frazier and his expert opinion.

In sum, the Court erred in valuing the Property based on misleading sales, liquidation appraisals, and unaccepted offers that were not comparable to what this Property would fetch in a hypothetical sale.  After all, "[w]ithout being based on comparable sales, the valuation cannot have been a comparable-sales valuation." *Palmer Ranch Holdings Ltd. v. Comm'r*, 812 F.3d 982, 1003 (11th Cir. 2016).  This Court should reverse.

## IV.    Penalties Could Not Be Imposed.

The Court's sole basis to impose penalties was its determination (based on the evidence it had admitted) that Oconee had grossly overvalued the donation. (Doc.15-14 pp. 854-55).  Because the Court's valuation analysis was flawed and based on the incorrect record, the imposition of penalties was also erroneous. Further, as explained above, Oconee had reasonable cause in any event.

## <u>CONCLUSION</u>

For these reasons, the Tax Court's decision should be reversed.

This 21st day of May, 2025.

*/s/ Vivian D. Hoard*
Vivian D. Hoard
Georgia Bar No. 358119
*vhoard@foxrothschild.com*

FOX ROTHSCHILD LLP
999 Peachtree Street, N.E.
Suite 1500
Atlanta, Georgia 30309
(404) 962-1000 – *Telephone*

(404) 962-1200 – *Facsimile*
*Counsel for Petitioner/Appellant*

## **CERTIFICATE OF COMPLIANCE**

In compliance with Federal Rule of Appellate Procedure 32(a)(7)(B)(i), the undersigned counsel hereby certifies that this Brief is typed in 14-point Times New Roman and complies with the type-volume limitation of FRAP 32(a)(7) and contains 12,823 words.

*/s/ Vivian D. Hoard*
Vivian D. Hoard

## **CERTIFICATE OF SERVICE**

This is to certify that I have caused a true and correct copy of the foregoing

to be served via the Court's CM/ECF system, which shall send notification of

such filing to all counsel of record as follows:

Geoffrey J. Klimas
Douglas C. Rennie
United States Department of Justice
Tax Division, Appellate Section
Post Office Box 502
Washington, D.C. 20044
*geoffrey.j.klimas@usdoj.gov*
*douglas.c.rennie@usdoj.gov*

This 21st day of May, 2025.

*/s/ Vivian D. Hoard*
Vivian D. Hoard
Georgia Bar No. 358119
*vhoard@foxrothschild.com*
FOX ROTHSCHILD LLP
999 Peachtree Street, N.E.
Suite 1500
Atlanta, Georgia 30309
(404) 962-1000 – *Telephone*
(404) 962-1200 – *Facsimile*
*Counsel for Petitioner/Appellant*